IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

IN THE MATTER OF THE SEARCH OF:
**Cellular telephones currently located at the Arlington County Police Station, as further described in Attachment A**

Case No. 1:26-SW-108, 109, 110, 111, 112, 113

**AFFIDAVIT**

I, Kevin McLinden, being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I have been employed as a Special Agent with Homeland Security Investigations ("HSI") since December 2019. I graduated from the Criminal Investigator Training Program and the HSI Special Agent Training Program at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. Prior to HSI, I served as a Criminal Investigator in a number of other law enforcement organizations, including as a Special Agent with the Diplomatic Security Service and as a Deputy U.S. Marshal with the U.S. Marshals Service. I have completed FLETC's Criminal Investigator Training Program ("CITP"), the Deputy U.S. Marshal Academy, and the HSI Special Agent Training ("HSISAT") course.

3.      As an HSI Special Agent, I am familiar with 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of controlled substances), which prohibits knowingly or intentionally manufacturing, distributing, dispensing, or possessing with intent to manufacture,

1

distribute, or dispense a controlled substance. I have investigated numerous cases involving this statute and am familiar with the methods used by drug trafficking organizations to purchase, transport, store, and distribute drugs.

4.    I am also familiar with 21 U.S.C. § 846 (attempt and conspiracy), which provides that any person who attempts or conspires to commit any offense under this subchapter is subject to the same penalties as those prescribed for the offense itself.

5.    Based on my training and experience, narcotics traffickers often use cellular phones and computers to communicate between conspirators and store contact information for co-conspirators, which can be shared to facilitate communication within the trafficking group.

6.    Drug trafficking organizations frequently use code words to refer to quantities and types of narcotics to avoid detection by law enforcement.

7.    Drug traffickers may take photographs or videos of drugs and/or currency to keep records of sales, advertise to customers, or for personal gratification. These images may also depict suspects and co-conspirators, documenting their activities and notoriety, and may be stored in photo albums or shared via social media.

8.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

9.    The property to be searched is electronically stored data particularly described in Attachment A.

10.    The Target Devices are six mobile phones belonging to three individuals: BRYAN RAMOS, CARLOS RIVERA MORALES, and MARVIN MARTINEZ-AVILES. The devices include:

2

a. A black iPhone entered into Arlington County Police Department (ACPD) Evidence under Tag #409183 seized from BRYAN RAMOS on July 3, 2025. (Target Device One associated with 1:26-SW-108).

b. A black Samsung Galaxy entered into ACPD Evidence under Tag #409179 seized from BRYAN RAMOS on July 3, 2025. (Target Device Two associated with 1:26-SW-109).

c. A pink iPhone entered into ACPD Evidence under Tag #409178 seized from BRYAN RAMOS on July 3, 2025. (Target Device Three associated with 1:26-SW-110).

    i. Exhibit B in Attachment A is a photograph depicting the phones seized from RAMOS (i.e., Target Devices One, Two, and Three).

d. A black Motorola cell phone entered into ACPD Evidence under Tag #410767 seized from CARLOS RIVERA MORALES on August 20, 2025. (Target Device Four associated with 1:26-SW-111).

    i. Exhibit C in Attachment A is a photograph depicting the phone seized from RIVERA MORALES (i.e., Target Device Four).

e. A blue Samsung cell phone entered into ACPD Evidence under Tag #411836 seized from MARVIN MARTINEZ-AVILES on September 26, 2025. (Target Device Five associated with 1:26-SW-112).

f. A black iPhone entered into ACPD Evidence under Tag #411837 seized from MARVIN MARTINEZ-AVILES on September 26, 2025. (Target Device Six associated with 1:26-SW-113).

i.  Exhibit D in Attachment A is a photograph depicting the phones seized from

MARTINEZ-AVILES (i.e., Target Devices Five and Six).

**PROBABLE CAUSE**

11.    All of the information contained below is either personally known to the affiant or has been provided by other law enforcement officers, named witnesses, confidential sources, or was obtained through information which was previously subpoenaed or seized.

12.    Based on the information set forth below, the affiant believes probable cause exists that CARLOS RIVERA MORALES, BRYAN RAMOS, and MARTIN MARTINEZ AVILES and others known and unknown to your affiant have violated the following statutes: (1) Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), Distribution of  Controlled Substances and Possession with the Intent to Distribute Controlled Substances, and (2) Title 21, United States Code, Section 846, Conspiracy to Distribute and Possess with the Intent to Distribute Controlled Substances.

**A.  Traffic Stop within Arlington County**

13.    On or about July 3, 2025, Corporal N. Phan with the Arlington County Police Department initiated a traffic stop on a white Acura sedan displaying Virginia temporary license plate K13139 at the 2400 block of 26th Rd S in Arlington County, which is located in the Eastern District of Virginia. The stop was initiated because the NCIC/VCIN return showed that the driving status of the registered owner, CARLOS RIVERA MORALES, was suspended in Virginia.

14.    Corporal Phan approached the vehicle and observed that BRYAN RAMOS was the driver and sole occupant of the vehicle. Corporal Phan previously knew RAMOS to not have

4

a driver's license. RAMOS further confirmed that he did not possess a valid driver's license, and a traffic citation was issued accordingly.

15.    After the traffic citation was issued, Corporal Phan conducted an inventory search of the vehicle prior to it being impounded. Upon opening the driver's side door, Corporal Phan observed two small plastic pop-top containers, commonly known as "trash cans." The "trash cans" contained white powdery residue and, based on my training and experience, I know that these "trash cans" are commonly utilized to store narcotics.

16.    The inventory search of the vehicle resulted in Corporal Phan locating and seizing:

    a.  Over $10,000 in U.S. currency,

    b.  Approximately 100 blue circular pressed pills with "M" imprinted on one side and "30" imprinted on the other,

    c.  Four small baggies containing white powder that tested positive for the presence of cocaine,

    d.  Nine "trash can" containers with a white rock-like substance that tested positive for the presence of cocaine,

    e.  Nine black "trash can" containers with powdery residue,

    f.  A large quantity of empty "trash can" containers with no residue,

    g.  A large quantity of small, empty, unused baggies similar to the baggies with white powder,

    h.  A digital scale, and

    i.  Three cell phones. (Those three cell phones are Target Devices One, Two, and Three).

17. RAMOS was arrested for Possession with Intent to Distribute Controlled Substances, in violation of Virginia Code Section 18.2-248, as amended.

18. On October 16, 2025, the Virginia Department of Forensic Science provided a certificate of analysis showing that the controlled substances located during the traffic stop contained fentanyl, heroin and cocaine.

## B. Jail Calls within the Arlington County Detention Facility

19. While being held at the Arlington County Detention Facility located at 1435 N Courthouse Rd in Arlington County, which is located in the Eastern District of Virginia, RAMOS communicated over the monitored jail phone lines with a person that was utilizing the phone number 571-252-0696

20. Subscriber information shows that the phone number 571-252-0696 belongs to RIVERA MORALES, who was the registered owner of the Acura sedan that RAMOS was originally stopped in.

a. The following is dialogue from recorded jail calls. The calls were in Spanish and translated into English by Corporal C. Caban of the Arlington County Police Department, who has native proficiency in Spanish: On July 10, 2025, at approximately 1008 hours, RAMOS instructs RIVERA MORALES: "Yeah, try to collect everything and let me know because I'm going to give you some other stuff to move. Grab the old phone and unlock it because that's where the kid's number is that's going to pass it to me. I'm going to explain to you how it's going to go. He's going to pass, you know, one of those things that are 125. From one of those you're going to get 6, so it's going to make 2 which is going to be 1,200. And those

6

cups of candy aren't going to go like they're from the zone they're going to go like halfway."

21.     Based on my training and experience, RAMOS and RIVERA MORALES are speaking about collecting proceeds from narcotics transactions. RAMOS is instructing RIVERA MORALES to facilitate distribution of controlled substances. RAMOS then states that the third party will provide him with "125," which is a common weight of narcotics that is purchased, equaling 1/8th of a kilogram.

    a. On July 13, 2025, at approximately 1735 hours, RIVERA MORALES begins the conversation and says, "What's up? The 100 bars, the blue painted wood bars, 6 ½ bars."

22.     Based on my training and experience, "blue painted wood bars" is a fentanyl-laced blue pressed pill sold on the streets as Oxycodone.

    a. On July 17, 2025, at approximately 1042 hours:

        i. RAMOS asks, "What's up with the other onion? You still have it?"

        ii. RIVERA MORALES replies, "I still have the same one. I told my boys from Alexandria if they wanted to make money, for 150 of the big ones, I asked them to give me 8 bars and from there we'll take 7. We'll reup them."

23.     Based on my training and experience, an onion is a common term utilized by drug distributors to describe an ounce of controlled substances. RAMOS is inquiring if RIVERA MORALES still has the controlled substances in his possession, and RIVERA MORALES explains that he plans to provide other parties with narcotics for their own distribution.

    a. On July 21, 2025, at approximately 2120 hours:

     i.  RIVERA MORALES states, "This is what I'm going to do. I'm going to buy another onion, then, drop it off to your girlfriend."

    ii.  This indicates intent to purchase another ounce of controlled substances and deliver it to RAMOS's girlfriend.

## C. Surveillance of RIVERA MORALES

24. ACPD investigation revealed that RIVERA MORALES owns and operates a Chevrolet Captiva displaying Virginia license plate TGC2451 through an NCIC/VCIN query, as well as prior reports from Alexandria Police Department documenting RIVERA MORALES retrieving the Captiva after it was taken during a search warrant. On August 19, 2025, at approximately 1738 hours, the Arlington County Police Department's Tactical Unit located RIVERA MORALES's vehicle in the area of W. Braddock Rd. and Commonwealth Ave. in Alexandria, Virgina, which is located in the Eastern District of Virginia. The vehicle departed the area and was determined to be solely occupied by RIVERA MORALES. Corporal Phan and the Arlington County Police Department's Tactical Unit conducted continued surveillance on RIVERA MORALES and his vehicle for the next several hours and observed the following:

    a.  At approximately 1915 hours, RIVERA MORALES pulled his vehicle into the shopping center located at the 4100 block of Mount Vernon Ave. in Alexandria, VA. There were two unknown Hispanic females who appeared to be awaiting his arrival as their gaze was locked onto the vehicle as it approached. They immediately approached him once he parked. The two females appeared to be counting currency and passed it through the window to RIVERA MORALES. The two then received a small black item. Shortly after they departed from RIVERA MORALES's vehicle, they were seen going into the small black bag and began counting or sorting

through small items with particular care. Around this time, an unidentified Hispanic male approached RIVERA MORALES's vehicle and also handed him currency. A short time later, this Hispanic male received a small black bag from RIVERA MORALES and placed it in his pocket with particular care and attention, and then immediately departed the area. Based on my training, experience, and knowledge of the case, there is probable cause to believe these were drug transactions.

b. At approximately 2030 hours, Arlington County Police Department's Tactical Units observed RIVERA MORALES park at Motel 6 located at 6640 Arlington Blvd, Falls Church, VA 22042.  This motel is located within the Eastern District of Virginia. RIVERA MORALES and a female entered room #204. At approximately 2108 hours, a Ford F-series pickup truck arrived at the same location and parked next to RIVERA MORALES's vehicle. Shortly thereafter, three unknown individuals approached and entered the hotel room. The driver of the vehicle exited the room and left by himself at approximately 2130 hours.

25.    On August 20, 2025, at approximately 1812 hours, members of the Arlington County Police Department's Tactical Unit observed RIVERA MORALES exit from room #204 with a Hispanic female wearing a light blue crop top and black shorts, and entered into the Chevrolet Captiva displaying VA license plate TGC2451. Members of the Arlington County Police Department's Tactical Unit continued surveillance on RIVERA MORALES and his vehicle for the next several hours and observed the following:

a. At approximately 2000 hours, RIVERA MORALES parked at the Pizza Hut located at 1049 W Glebe Rd with the same Hispanic female. The female walked into the Pizza Hut at approximately 2005 hours and entered the first restroom

9

underneath the restroom sign to the left. At approximately 2011 hours, the female exits the Pizza Hut and re-enters the Chevrolet Captiva in the passenger seat. Corporal Costello-Mays, a member of the Arlington County Police Department's Tactical Unit, entered the same bathroom the female exited and, on top of the pile of trash in the trash can, located a gray pop-up container shaped like a "trash can" with white residue, similar to the type found in the inventory search of the RIVERA MORALES's vehicle that RAMOS was stopped in.

b. At approximately 2017 hours, RIVERA MORALES entered the parking lot of the retail strip, located at the 4100 block of Mount Vernon Ave. Upon his arrival, Corporal Poveda, a member of the Arlington County Police Department's Tactical Unit, observed multiple individuals approach the driver's side of the vehicle where RIVERA MORALES was seated. Over the following two hours, Corporal Poveda observed at least ten different individuals arrive at and depart from the area of the vehicle. During these encounters, Corporal Poveda noted individuals leaning into the vehicle without anything visible in their hands, and when exiting, those same individuals were observed to be holding items. Due to the lighting conditions and the movements of the subjects, Corporal Poveda was unable to clearly identify the items being exchanged. Corporal Poveda noted that while individuals were at RIVER MORALES's vehicle, they would constantly scan their surroundings. At approximately 2208 hours, an Alexandria City Police Department marked patrol vehicle arrived at the retail strip. Corporal Poveda advised that when the individuals lingering near RIVERA MORALES's car saw the marked police vehicle, they all immediately began leaving the area. Corporal Poveda observed RIVERA

10

MORALES's vehicle exit the retail strip and travel southbound on Mount Vernon Ave. Based on my training, experience, and knowledge of the case, there is probable cause to believe these were drug transactions.

c.  The vehicle traveled into Arlington County, VA. Sergeant Mason with the Arlington County Police Department conducted a traffic stop of the vehicle at S Glebe Rd. near the intersection of Columbia Pike for RIVERA MORALES's driving status being suspended out of Virginia. At the time of the traffic stop, there were two individuals in the car. RIVERA MORALES was the driver and KEVIN JOEL BUSTILLO CISNADO. Both occupants were removed from the vehicle. During the removal, Target Device 4 was located on RIVERA MORALES's person.

  i.  During the traffic stop, Sergeant Mason began an inventory search of RIVERA MORALES's vehicle. Sergeant Mason located small pop-up containers that look like "trash cans" in the center console. Unused empty trash cans are commonly used by drug distributors to package narcotics. Due to the nature of what he found, Sergeant Mason advised that he conducted a search of RIVERA MORALES. He located additional "trash cans" in RIVERA MORALES's front pocket. They were blue and purple in color and contained white rock-like substances. In that same pocket, he also located a black canister that contained purple "trash cans." The purple "trash cans" contained a brownish colored powder.

  ii.  Sergeant Mason finished the search of the vehicle additionally located the following:

1. plastic bag containing blue circular pills with "M" imprinted on one side and "30" imprinted on the other (foot well area of the front passenger seat),

2. a Glock 43 G5 (center console), and

3. a latex glove with a 9mm bullet inside of it (center console).

    iii. The Glock pistol was checked through NCIC and returned as a stolen firearm out of the Sampson County Sheriff's Office in Clinton, NC.

26. On August 21, 2025, at approximately 0600 hours the Virginia State Police ("VSP") executed a search warrant for Motel 6 room #204 located at 6640 Arlington Blvd, Falls Church, VA 22042. This search warrant execution by VSP 1st Sgt O'Donnell yielded the following:

a. Approximately 20 grams of a blue circular pressed pills with "30" imprinted on them

b. Approximately 16.7g of powder in pop-up lid containers

c. Twenty small blue plastic ziplock baggies with white powder weighing approximately 9.6g

d. Approximately 44.5g of a white rock-like substance

e. Cigar wrapper with white powder weighing approximately 3.5g

f. Unused blue plastic ziplock baggies baggies

g. And 2 pop-up lid containers.

27. Exhibit A below is a photograph of the materials seized during that search:

12



*Exhibit A*

## D. Communication with Marvin MARTINEZ-AVILES (AKA "Maniaco")

28.    Based on an ongoing investigation, law enforcement identified Marvin Josue MARTINEZ-AVILES (AKA "Maniaco") as a central figure in a narcotics distribution conspiracy involving associates RIVERA MORALES and RAMOS. From recorded jail calls communications and surveillance have revealed the following:

    a.   On February 27, 2025, Officers of the Alexandria City Police Department observed MARTINEZ-AVILES conduct a hand-to-hand narcotics transaction near 3903 Mount Vernon Ave, Alexandria, Virginia. MARTINEZ-AVILES fled but was apprehended and found in possession of fentanyl.

    b.   On July 8, 2025, while at the Arlington County Detention Facility, RAMOS instructed RIVERA MORALES to contact "Maniaco" at phone number 703-472-1970. During this call, "Maniaco" advised RAMOS of increased police presence and referenced being pulled over recently. RAMOS instructed "Maniaco" to take the "muneca" (a term identified as slang for guns) and handle individuals who had

13

threatened them. The phone number 703-472-1970 is associated with two phones belonging to MARVIN MARTINEZ-AVILES (also known as "Maniaco"), which were later seized and entered into evidence as Target Devices 5 and 6.

c. On July 10, 2025, RAMOS directed RIVERA MORALES to collect proceeds from narcotics transactions and facilitate further distribution, referencing quantities and coded language for drugs and money.

d. On July 21, 2025, RIVERA MORALES stated he would "buy another onion, then, drop it off to your girlfriend," with "onion" being slang for an ounce of controlled substances.

29.    After ACPD's stop of RIVERA MORALES, intercepted jail calls between RAMOS and "Maniaco" on August 21, 2025, included discussions about traveling to distribute and buy controlled substances, with references to "large bar" (money) and "munecas" (guns). "Maniaco" confirmed ongoing sales, stating, "they're asking me for them often," and referencing "doors: the moras," identified as slang for purple containers of narcotics. After ACPD's stop of RIVERA MORALES, intercepted jail calls between RAMOS and "Maniaco" on August 21, 2025, included discussions about traveling to distribute and buy controlled substances, with references to "large bar" (money) and "muñecas" (guns). "Maniaco" confirmed ongoing sales, stating, "they're asking me for them often," and referenced "doors: the moras," identified as slang for purple containers of narcotics. These calls were made from jail by RAMOS to "Maniaco" at phone number 703-472-1970. We believe that this is same line associated with at least one of the target devices for seizure. All call data was obtained directly from the outgoing jail calls.

30.    Surveillance and real-time cell phone geolocation data between September 11 and September 18, 2025, placed MARTINEZ-AVILES at locations consistent with ongoing narcotics

14

activity, including 6116 The Parkway, Alexandria, VA, and the Mount Vernon Trail area. Law enforcement visually identified MARTINEZ-AVILES during these operations.

31.     Further investigation revealed MARTINEZ-AVILES made regular trips to 157 Fleet Street, Oxon Hill, Maryland, believed to be a supply location for narcotics, consistent with patterns of distribution.

32.     On September 25, 2025, an ACPD search warrant was executed on MARTINEZ-AVILES, resulting in the seizure of two smartphones, Target Devices 5 and 6, believed to contain evidence of narcotics distribution.

33.     Based on these facts, including specific intercepted communications, observed drug transactions, and corroborating physical evidence, there is probable cause to believe that MARTINEZ-AVILES is engaged in the ongoing possession, distribution, and conspiracy to distribute controlled substances, and that evidence of these crimes will be found on his person and in his electronic devices.

**E.  Additional Matters Supporting Probable Cause to Search the TARGET DEVICES**

34.     Based on my training and experience and also the training and experience of other law enforcement agents, I know the following regarding cellular phones and the trafficking of drugs:

   a. Drug traffickers and users commonly utilize cellular phones and digital display contact pagers as well as other communication devices, to keep in constant contact with their suppliers, associates, and clients in drug trafficking through such features to include, but not limited to, text messaging, instant messaging, e-mail and shared software.

15

b. Drug traffickers and users commonly store records of drug transactions in cellular phones or communication devices within their residences and/or on their properties, vehicles, or person(s) for their ready access and to conceal from law enforcement.

c. Drug traffickers and users commonly make and maintain business records, specifically, it is quite common for those involved in the manufacture, sale, purchase, and transportation of controlled substances to generate and maintain writings, books, records, receipts, notes, ledgers, lists, airline tickets, money orders, package and shipping labels, and other memoranda to assist in their criminal activities. These materials are created and maintained in much the same way and for the same reasons as persons involved in legitimate businesses. The reason for this is that drug traffickers must maintain records in order to know the current status of the various illegal transactions in which they are involved. Since the activity is, by its very nature, clandestine and involves multiple complex financial transactions and the possibility of error and mistake is considerable due to the number, complexity and frequency of the various transactions without the aid of records.

d. Drug traffickers and users commonly maintain addresses or telephone numbers in books or papers, which reflect names, addresses and/or telephone numbers of their associates in drug trafficking. They also store such information, as well as photographs, messages, and personal notes in electronic equipment including, but not limited to, computers, cellular phones and other electronic software and mediums.

e. Drug traffickers and users often take or cause to be taken photographs and/or videotape of themselves, their associates, their property, and evidence of their drug

16

trafficking.  These are usually maintained in their possessions and/or residences or on their phones or other electronic software and mediums.

f.  Drug traffickers and users have been known to utilize computers and all electronic data processing units, to include all internal and external storage devices and related hardware and software that might include addresses or telephone numbers in computerized files which reflect names, addresses and/or telephone numbers of their associates in drug trafficking.  They also utilize computers to maintain and electronically record receipts, notes, ledgers, owe sheets, financial information, money orders, and other papers relating the transportation, ordering, sale, and distribution of controlled substances.  Drug traffickers have also been known to utilize computers and cellular phones, or communication devices to keep in constant contact with their suppliers, associates, and clients in drug trafficking through the use of internet service providers and electronic mail systems.

35.  Due to the above facts, and also based upon the aforementioned training and experience, law enforcement believes that evidence related to the possession of the firearm while trafficking in narcotics may be found within the **TARGET DEVICES.**  Such evidence is likely to include information, as discussed above, in relation to drug trafficking or evidence related to BRYAN RAMOS, CARLOS RIVERA MORALES, and MARTIN MARTINEZ AVILES distributing or possessing controlled substances with intent to distribute, and conspiring with others to distribute or possess controlled substances with intent to distribute, in violation of federal law.

36.  The Target Devices are currently in storage at the Arlington County Police Department evidence vault located at 1425 N Courthouse Rd, Arlington, Virginia. In my training

and experience, I know that the Target Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when seized.

## TECHNICAL TERMS

37.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a. ***Wireless telephone***.    A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.    These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.    A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.    In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.    These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.    Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. ***Digital camera***.    A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.    Digital cameras use a variety of fixed and removable storage media to store their recorded images.    Images can usually

be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*.  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS*.  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly

19

available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision. Such devices can be found within wireless telephones.

e. *IP Address*. An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f. *Internet*. The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

38. Based on my training, experience, and research, I know that the **TARGET DEVICES** have capabilities that allow them to demonstrate the capabilities described above and/or can store information relating to the capabilities described above. In my training and

experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device in question.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

39.     Based on my knowledge, training, and experience, I know that electronic devices, such as the **TARGET DEVICES**, can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on electronic devices.  This information can sometimes be recovered with forensics tools.

40.     There is probable cause to believe that things that were once stored on the **TARGET DEVICES** may still be stored there, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a device or storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a device or storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on an electronic device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

21

c.  Wholly apart from user-generated files, electronic storage media—in particular, an electronic device's internal hard drive—contain electronic evidence of how a an electronic device has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  User typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

41.  ***Forensic evidence***.  As further described in Attachment B, this Application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **TARGET DEVICES** was used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the **TARGET DEVICES** because:

a.  Data on an electronic device or storage medium can provide evidence of a file that was once on the device or storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and

22

passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Electronic file systems can record information about the dates files were created and the sequence in which they were created.

b.  Forensic evidence on a device or storage medium also can indicate who has used or controlled the device or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device or storage medium works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices or storage media were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on an electronic device or storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on an electronic device or storage medium is evidence may depend on other information stored on the device or storage medium and the application of knowledge about how a device or storage medium behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device or storage medium was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a device or storage medium.

42. ***Nature of examination***. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the Warrant I am applying for would permit the examination of the **TARGET DEVICES** consistent with the Warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the Warrant.

## **CONCLUSION**

43. I submit that this Affidavit supports probable cause for a Search Warrant authorizing the examination of the **TARGET DEVICES** described in Attachment A to seek the items described in Attachment B.

Respectfully Submitted,

//s// Kevin McLinden

_____
Kevin McLinden
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me this 6th day of February 2026.

_____
IVAN D. DAVIS
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### *Property to be Searched*

The property to be searched includes the following devices: four Apple iPhones and two Samsung Galaxy mobile phones, and one Motorola Edge (collectively, the "TARGET DEVICES"). The TARGET DEVICES are currently located at the Arlington County Police Department at 1425 N Courthouse Rd, Arlington, VA 22201.

(1) A BLACK APPLE iPHONE CELLULAR PHONE MODEL 14 PRO, Evidence Tag# 409183. The iPhone is currently located at the Arlington County Police Department at 1425 N Courthouse Rd, Arlington, VA 22201 (Exhibit B) (Target Device One associated with 1:26-SW-108).

(2) A BLACK SAMSUNG CELLULAR PHONE MODEL GALAXY, Evidence Tag# 409179. The mobile phone is currently located at the Arlington County Police Department at 1425 N Courthouse Rd, Arlington, VA 22201 (Exhibit B) (Target Device Two associated with 1:26-SW-109).

(3) A PINK APPLE iPHONE CELLULAR PHONE MODEL 14 PRO, IMEI #356165442409398. The iPhone is currently located at the Arlington County Police Department at 1425 N Courthouse Rd, Arlington, VA 22201 (Exhibit B) (Target Device Three associated with 1:26-SW-110).

(4) A BLACK MOTOROLA CELLULAR PHONE MODEL EDGE, Evidence Tag# 410767. The mobile phone is currently located at the Arlington County Police Department at 1425 N Courthouse Rd, Arlington, VA 22201 (Exhibit C) (Target Device Four associated with 1:26-SW-111).

(5) A BLUE SAMSUNG CELLULAR TELEPHONE entered into ACPD Evidence under Tag #411836. The mobile phone is currently located at the Arlington County Police Department at 1425 N Courthouse Rd, Arlington, VA 22201 (Exhibit D) (Target Device Five associated with 1:26-SW-112).

(6) A BLACK APPLE IPHONE CELLULAR TELEPHONE entered into ACPD Evidence under Tag #411837. (Exhibit D) (Target Device Six associated with 1:26-SW-113).

This warrant authorizes the forensic examination of the TARGET DEVICES for the purpose of identifying the electronically stored information described in Attachment B.

## EXHIBITS



*Exhibit B*



*Exhibit C*



*Exhibit D*

28

**ATTACHMENT B**

1.      All records on the Device described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846 and involve BRYAN RAMOS, CARLOS RIVERA MORALES, and MARVIN MARTINEZ-AVILES, or other co-conspirators known and unknown to your affiant at this time, including:

      a.   Messages, voicemails, e-mails, photographs, telephone numbers, notes, and the like, relating to the sale and/or purchase of controlled substances;

      b.   lists of customers and related identifying information;

      c.   types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      d.   any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

      e.   any information recording the subjects schedule or travel;

      f.   all bank records, checks, credit card bills, account information, and other financial records, including cryptocurrency exchanges or wallets.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including

29

any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.